<u>AFFIDAVIT</u>

I, XXXX X. XXXXXXX, Special Agent of the Drug
Enforcement Administration (DEA), Washington Division
Office (WDO), Washington, DC, (hereinafter Affiant) being
duly sworn, depose and state the following:

<u>Introduction</u>

1.    I am "an investigative or law enforcement
officer" of the United States within the meaning of Title
18, United State Code Section 2510(7), that is, an officer
of the United States who is empowered by law to conduct
investigations of and to make arrests for the offenses
enumerated in Section 2515 of Title 18, United States Code.

2.    I have been a Special Agent (SA) with the DEA
since XXXX.  I am currently assigned to Enforcement Group
XXXXXXX at the Washington Division Office, located in the
District of Columbia.  While with the DEA, I have
investigated, and assisted in the investigation of,
hundreds of narcotics violators.  I have previously
participated in investigations which have led to the arrest
and conviction of narcotics dealers.  Since 1997, I have
received training and experience in interviewing and
interrogation techniques, arrest procedures, search warrant
applications, surveillance, undercover operations,
operations involving cooperating sources, and a variety of

other investigative tools available to law enforcement officers.  In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of drug conspiracies.  In the course of conducting these investigations, your Affiant has been involved in the use of the following investigative techniques: interviewing informants and Cooperating Sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, and other contraband.

3.  Based on your Affiant's training, experience, and participation in narcotic and drug-related investigations and the training and experience of other Agents with whom I am working closely with in this investigation, your Affiant knows that:

a)   Individuals who deal in illegal controlled
substances maintain books, records receipts,
notes, ledgers, bank records, money orders, and
other documents relating to the importation,
manufacture, transportation, ordering, sales,
purchase, and distribution of illegal controlled
substances.  These books, records, receipts,
ledgers, money orders, etc., are maintained where
the dealers in those illegal controlled
substances have ready access to them, such as in
a secure location within their residences, the
residences of family members, friends and
associates, in the places of operation of the
drug distribution activity, such as a stash house
or safe house, or in a business location with
which the trafficker is associated or otherwise
has some degree of command or control over.

b)   Individuals who deal in illegal controlled
substances routinely conceal in their residences
and/or the residences of family members, friends
and associates, as well as their business
locations, and/or in the places of operation of
the drug distribution activity, such as a stash
house or safe house, large quantities of

currency, financial instruments, precious stones/metals, jewelry, electronics equipment, and other items of value, which typically are proceeds of illegal controlled substance transactions.

c)    It is common for individuals who deal in the sale of illegal controlled substances, particularly methamphetamine, to secrete contraband related to the activity, such as scales, razors, packaging materials, cutting agents, glassware, microwave ovens, laboratory equipment, chemicals, pots, pans, dishes, and other items used in the preparation and packaging of methamphetamine at their residences, or the residences of family members, friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

d)    Individuals who deal in the sale and distribution of controlled substances commonly maintain addresses and telephone number books or other documents which reflect the names, addresses, and/or telephone numbers for their associates in their illegal drug organization.

These individuals utilize cellular telephones and pagers, which reflect names, addresses, and/or telephone systems to maintain contact with their associates in their illegal drug businesses. These telephone records, bills and pager numbers are often found in their place of residence, or the residence of family members, friends, or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

e)    Individuals who deal in the illegal controlled substances often take photographs of themselves, their associates, their property and illegal contraband.  These photos are usually maintained in their place of residence, or the residences of family members, friends, or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

f)    Individuals who deal in the distribution of illegal controlled substances often maintain records relative to their drug trafficking activities.  These records and documents are usually secreted in their places of residence, or

the residences of family members, friends, or associates, in their businesses, or in the places of operation of the drug distribution activity such as a stash house or safe house. These documents often include ledgers, account books, calculations, or other notations which reflect inventories and quantities of narcotics purchased and distributed. The documents also may include "pay-owe sheets," which are documents that bear calculations, customers names, quantities, and prices. The notations made on or in these documents are often encrypted by the trafficker in an attempt to disguise the true nature of the records from law enforcement.

g)    Individuals who distribute illegal controlled substances maintain documents, letters, and records relating to the illegal activity for long periods of time. This documentary evidence is usually secreted in their places of residence, or the residences of family members, friends, or associates, in their businesses, or in the places of operation of the drug distribution activity such as a stash house or safe house. This documentary evidence

includes, but is not limited to, telephone
numbers, telephone books, address books, credit
card receipts, hotel receipts, train and bus
tickets, airline boarding passes or itineraries,
baggage claim tickets, car rental receipts,
amounts and records in fictitious names, false
identification documents, money orders, casino
receipts, account notations, "pay-owe sheets,"
cashiers checks relating to transactions, and
other records indicating the existence of storage
facilities used in narcotics trafficking.

h)   Individuals involved in the trafficking of
illicit narcotics often own, possess, and/or use
weapons as a means to facilitate their drug
trafficking activities.  These weapons are most
often secreted in their residences, the
residences of family members, friends or
associates, in their business locations, or in
the places of drug distribution activity, such as
a stash house or safe house.

4.  Based on the investigation in which your affiant
has participated in and for the reasons which will be set
forth herein, there is probable cause to believe that
XXXXXX XX XX XXXXX, and several of his associates, known

and unknown, are committing the following federal offenses: (i) possession with the intent to distribute controlled substances, in violation of Title  21 United States Code, §841 (a)(1); (ii) conspiracy to commit such offenses, in violation of Title 21 United States Code, § 846; (iii)  use of communications facilities in the commission of the above offenses involving controlled substances, in violation of Title 21 United States Code, § 843(b).  In addition, I believe for the reasons to be set forth infra, there is probable cause to show that within, xxxx xxxx xxxxxxx xxxx xxxx, Washington, DC, there is evidence of those crimes and that residence has been, and will continue to be used, by XXXXXX XX XX XXXXX and his associates in furtherance of the crimes enumerated above.

5.    Throughout this investigation, law enforcement officers and agents have worked together to collect and record information about the illegal activities of those under investigation.  This affidavit is based in part on personal knowledge derived from the participation of your Affiant in the investigation, and in part, upon the sources of information and belief.  The sources of information and belief include statements made by defendants, witnesses, or other cooperating sources of information, observations made by undercover officers, and subpoenaed information.

6.    Not every fact known to this investigation or by
the government is set forth in this affidavit.
Additionally, unless otherwise noted, wherever in this
affidavit I assert that a statement was made by an
individual, that statement is described in substance, and
in part, and is not intended to be a verbatim recitation of
the entire statement.  I believe the information presented
in this affidavit will establish probable cause to show
that XXXXXX XX XX XXXXX have been engaged in those crimes
enumerated above and that there is evidence of those crimes
within the residence located at XXXX XXXX XXXXXX, XX, XXXX,
XXXXXXXXXX, XX.   Therefore, only those aspects known to
this investigation which support that probable cause are
presented in this affidavit.

Location to be Searched

7.    The Target Address is described as a condominium
apartment located on the XXXXXXX floor of a multi-family
residential building in Northwest, Washington, DC.   The
front door of the Target Address is XXXXX in color and
appears to be constructed of XXXX.   Further examination
will reveal that there is a metal colored doorknocker and
peep-hole affixed to the top center of the door; the
knocker clearly displays the numerals "XXX."

Background of the Investigation

8.    On June 30, 2005, Special Agents and Task Force Officers from the Washington Division Office of the DEA arrested five individuals in Washington, DC, on a variety of federal charges including, but not limited to, possession with the intent to distribute methamphetamine. The arrests were the culmination of a six-month multi-jurisdictional investigation of an organization responsible for the transportation of multiple pounds of methamphetamine from XXXXXXX, XXXXXXX, into the metropolitan areas of Northern Virginia and District of Columbia.

9.    Amongst the individuals arrested was a XXXXXXX male identified as XXXXXX XX XX XXXXX.  The investigation further revealed that XX XX XXXXX and other members of this organization profited from the re-distribution of this methamphetamine to a network of customers in the District of Columbia and elsewhere.  XX XX XXXXX and other members of the organization utilized commercial package services, apartments of associates, cellular telephones, and rental cars in the routine conduct of their illegal activities.

10.    Subsequent to the arrest of XX XX XXXXX, investigators seized a variety of items of evidentiary significance.  Amongst those items included approximately one ounce of a substance testing positive for

methamphetamine, a container with a hidden compartment, a cellular telephone, and a variety of miscellaneous documents.  The significance of one of those documents is discussed below.

11.  As a result of these arrests, investigators searched XXXX X XXXXXXX, XX, XXXX, XXXXXXXXXX, XX, which was identified as a residence associated with XX XX XXXXX. The search resulted in the seizure of drug paraphernalia, small quantities of controlled substances, packaging materials, numerous containers with hidden compartments, and miscellaneous documents.

12.  In July 2005, DEA developed several cooperators from amongst the individuals arrested during this investigation.  Three cooperating defendants interviewed in July 2005 provided specific information pertaining to the drug trafficking activities of XX XX XXXXX.  Both cooperators entered into proffer agreements with the United States Attorney's Office for Eastern District of Virginia at the time of their interviews.  The information related by the cooperators was corroborated through the interviews of other witnesses/defendants, the observations of investigators, through the review of related evidence; the information related by the cooperators has been determined

to be reliable.  The cooperators related the following the
information during the interviews.

Cooperating Source Number One

13.  Cooperating Source Number one, hereinafter CS#1,
identified XX XX XXXXX as orchestrating the transportation
of methamphetamine from Atlanta, Georgia, to a location in
the District of Columbia.  CS#1 also knew that XX XX XXXXX
was distributing methamphetamine to a network of customers
in the Washington, DC, metropolitan area.

14.  CS#1 had come to know that XX XX XXXXX maintained
two residences in the District of Columbia in order to
facilitate his drug trafficking activities.  As recent as
July 1, 2005, CS#1 had met with XX XX XXXXX at an apartment
located at XXXX X XXXXXXX, XX, XXXX, XXXXXXXXXX, XX, for
the purpose of conducting a drug transaction.  CS#1 had met
with XX XX XXXXX at this residence on at least one other
occasion in or about May or June 2005.

15.  CS#1 met with XX XX XXXXX at a second residence
in Washington, DC.  CS#1 had accompanied XX XX XXXXX to
this location on one occasion in or about May or June 2005.
While at this residence, XX XX XXXXX introduced CS#1 to an
individual who XX XX XXXXX identified as his husband; CS#1
described this individual as a slim black male.  Also at or
about that time, CS#1 retrieved a sum of money from what

12

CS#1 described as a hiding place in a houseplant situated inside the residence. CS#1 estimated that the amount of money XX XX XXXXX displayed at that time was approximately $50,000. Based on one or more comments made by XX XX XXXXX at that time, CS#1 believed that XX XX XXXXX brought him/her to the residence because XX XX XXXXX wanted to show him/her how much money he was making selling drugs.

Cooperating Source Number Two

16. Cooperating Source Number Two, hereinafter CS#2, identified XX XX XXXXX as being involved in the distribution of methamphetamine in the District of Columbia. CS#2 had personally purchased over one pound of methamphetamine from XX XX XXXXX in numerous drug transactions occurring in 2004 and 2005. Conversely, CS#2 had sold several over ten grams of methamphetamine to XX XX XXXXX on two occasions in 2004. CS#2 last purchased methamphetamine from XX XX XXXXX on or about June 29, 2005.

17. Throughout his/her criminal interaction with XX XX XXXXX, CS#2 came to know that XX XX XXXXX maintained a number of residences in the District of Columbia to facilitate his drug trafficking activities. CS#2 identified two residences, which he/she knew XX XX XXXXX most recently maintained for that purpose.

18.  The first residence was described by CS#2 as being located on X XXXXXX, XX, XXXXXXXXX, XX.  CS#2 had met with XX XX XXXXX on a number of occasions at that residence for the purpose of conducting and/or arranging methamphetamine transactions.  Based in part on the description of the residence provided by CS#2, that residence was identified as XXXX X XXXXXXX, XX, XXXX, XXXXXXXXXX, XX.

19.  The second residence was described by CS#2 as being located in an apartment building on 25th Street, NW, Washington, DC.  CS#2 further described the building as being situated close to XXXXXX, a XXXXXX XXXX, and in the area where XXXX Street meets XX Street.  CS#2 knew the second residence as being primarily occupied by an individual he/she knew as "XXXXXX XXXXXXXX."  XX XX XXXXX had introduced XXXXXXXX to CS#2 as his XXXXXXXX.  At that time or in conversations to follow, XX XX XXXXX told CS#2 that XXXXXXXX worked for the XXXXXXXXXX and was a recreational user of the controlled substances MDMA and Ketamine.  XX XX XXXXX further told CS#2 that XXXXXXXX's employment often required XXXXXXXX to be away from the residence.

20.  CS#2 had met with XX XX XXXXX at XXXXXXXX's apartment on XXXX Street on numerous occasions in 2004 and

14

on at least one occasion in 2005.  CS#2 had often met with
XX XX XXXXX at the residence while XXXXXXXX was away from
the area.  CS#2 believed XX XX XXXXX had access to the
residence while XXXXXXXX was not home.  CS#2 held a number
of telephone conversations with XX XX XXXXX on a telephone
that he/she believed was located in the apartment.

21.  On at least one occasion, XX XX XXXXX and CS#2
used methamphetamine inside the residence on 25th Street.
At the time of the interview, CS#2 recalled that the last
time he/she used methamphetamine with XX XX XXXXX at the
apartment on 25th Street was in or about April 2004.  On
that occasion, XXXXXXXX had unexpectedly entered the
apartment and observed XX XX XXXXX and CS#2 using
methamphetamine; XXXXXXXX chastised XX XX XXXXX for using
drugs in the apartment.

22.  CS#2 held one or more conversations with XX XX
XXXXX relative to XX XX XXXXX's criminal activities at the
25th Street residence.  In 2004, XX XX XXXXX told CS#2 that
he stored money earned from the sale of methamphetamine at
the residence of his boyfriend who CS#2 knew at that time
was XXXXXXXX.  XX XX XXXXX also told CS#2 that he stored
the money at his boyfriend's residence because he was
afraid that if caught, police would find and take the
money.  XX XX XXXXX told CS#2 that XXXXXXXX worked for the

15

government but was a recreational user of the controlled substances MDMA and Ketamine.

23. CS#2 told investigators that sometime in 2003, he/she had observed XX XX XXXXX in possession of money while at XXXXXXXX's residence. At that time, CS#2 had entered the residence for the purpose of meeting with XX XX XXXXX. Upon entry, CS#2 observed XX XX XXXXX counting a sum of money CS#2 estimated was about $5,000. XX XX XXXXX immediately asked CS#2 to wait in the hallway while he counted the money.

24. Through his/her interaction with XX XX XXXXX in 2004, CS#2 came to know that prior to obtaining the residence on N Street, XX XX XXXXX had at one time maintained an apartment on the eighth floor of XXXX XXXXXXXXXX XXXXXX, XX, XXXXXXXXXX, XX, in which to facilitate his drug trafficking activities. CS#2 indicated that at this apartment, which was separate from XX XX XXXXX's residence at the time, XX XX XXXXXX arranged the sale of methamphetamine and other controlled substances to a network of customers. CS#2 also came to know that address was maintained by an associate of XX XX XXXXX. CS#2 commented that XX XX XXXXX had stopped using the apartment XXXX XXXXXXXXXX XXXXXX, XX, XXXXXXXXXX, XX sometime before the close 2004.

16

25.  CS#2 also reviewed with investigators names and telephone numbers stored in her/his cellular telephone and Palm Pilot Personal Digital Assistant (PDA).  Amongst the numbers identified by CS#2 in these devices were the name "XXXXXX XX XX XXXXX - home" and the telephone number XXX-XXX-XXXX.  CS#2 indicated that XX XX XXXXX had provided this telephone number to him/her as a number in which he could be contacted.

26.  CS#2 identified XXXXXXXX's District of Columbia motor vehicle operator's license photograph as the XXXXXX XXXXXXXX who he knew to be XX XX XXXXX's boyfriend and the individual he knew to reside at the apartment on 25th Street.

<u>Cooperating Source Number Three</u>

27.  Cooperating Source Number Three, hereinafter CS#3, identified XX XX XXXXX as a methamphetamine distributor operating in Washington, DC.  Through his/her interaction with XX XX XXXXX, CS#2 had come to know that XX XX XXXXX was procuring methamphetamine from a source in Atlanta, Georgia, transporting the methamphetamine from Atlanta, and redistributing it to a network of customers in Washington, DC.

28.  CS#2 had also come to know many of the methods used by XX XX XXXXX to further his methamphetamine

distribution operation.  CS#2 described a studio apartment

in Washington, DC, in which XX XX XXXXX utilized for using

and selling drugs.  CS#2 indicated that he/she had been to

that apartment on a number of occasions and, based in part

of the description provided by CS#2, the apartment was

identified by investigators as XXXX X XXXXXXX, XX, XXXX,

XXXXXXXXXX, XX.

29.  CS#2 also knew that XX XX XXXXX maintained a

second address in Washington, DC.  CS#2 described as being

located in a building situated near a public pool and a

school in Northwest Washington, DC.  CS#2 described two

instances in which he/she had visited the apartment, the

most recent being sometime in 2001.

30.  CS#2 believed that the apartment belonged to an

individual he knew only as "XXXXXX."  CS#2 knew "XXXXXX" to

be XX XX XXXXX's boyfriend and described "XXXXXX" as heavy

set black male in his forties.  Although CS#2 had

associated the apartment with "XXXXXX," CS#2 had not

observed "XXXXXX" at the location when he/she had been

there.  CS#2 recalled on one occasion XX XX XXXXX entering

the front door of the building using a card and entering

the apartment with a key.

31.  Between XXXX X, XXXX, and XXXX X, XXXX, XX XX

XXXXX held a conversation with CS#2.  CS#2 recalled that

conversation occurred while he/she and XX XX XXXXX were in custody at the United States Marshal Service cellblock in XXXXXXX, XX.  XX XX XXXXX told CS#2 that the police had searched his apartment but found nothing.  XX XX XXXXX also told CS#2 that all of the money was at "XXXXXX's."

<u>OTHER INFORMATION</u>

32.  Throughout the investigation, Special Agents have collected information pertaining to the criminal activities of XX XX XXXXX and his associates.  A query of the District of Columbia Department of Motor Vehicles revealed that XXXXXX Lee XXXXXXXX possess a valid operators license.  The license displays a photograph of XXXXXXXX, which was identified by CS#2 and matched the description of XX XX XXXXX's "husband" provided by CS#1 (the description and identification are described above).  The license further lists the address XXXX XXXX XXXXXX. XX, XXXX, XXXXXXXXXX, XX (the Target Address).

33.  On XXXX, XX, XXXX Special Agents visited XXXX XX XXXXXX in an effort to interview XXXXXXXX.  Although not receiving a response at apartment XXX, Special Agents were able to interview a neighbor.  During that interview, the neighbor indicated that he/she had observed the occupant of #XXX as recent as two three days before the interview.  The

neighbor described the occupant as black male who he/she knew as "XXXXXX."

34.    While in the neighborhood, investigators took note of the area in which the Target Address building was situated.    Investigators made the following observations: the building XXX XXXX XXXXXXX, XX, XXXXXXXXX, XX, was situated across XXXX Street from a XXXXXXX; the building was adjacent to XXXXXXX XX XXXX XXXXXXX; the building is situated on the corner of where XXXX Street meets XX Street.    As mentioned above, CS#2 provided a similar description of the location of the XXX Street apartment XX XX XXXXX maintained with XXXXXXXX.

35.    As described above, CS#2 identified a telephone number stored in the memory of his/her cellular telephone as "XX XX XXXXX home XXX-XXX-XXXX."    The telephone number XXX-XXX-XXXX was a listed telephone number for XXXXXX XXXXXXXX at the Target Address as recent as 2002.

36.    As mentioned above, investigators seized a number of documents from the person of XX XX XXXXX at the time of XXX arrest on XXXX XX, XXXX.    Amongst those documents included a valid international driver's license bearing XX XX XXXXX's photograph and the Target Address.

<u>Conclusion</u>

Based on the facts presented in this affidavit, Your Affiant asserts there is probable cause to show that the second address described CS#1 and CS#2 as being utilized by XX XX XXXXX in furtherance of drug crimes is the same as the Target Address described above.  Your Affiant further assets that there is probable cause to believe that within the XXXX XXXX XXXXXX. XX, XXXX, XXXXXXXXXX, XX, there is evidence of XX XX XXXXX's crimes enumerated above.  Specifically, probable cause exists to show that within that residence is evidence of crimes to include documents, records, and other items further described in <u>Schedule A</u> listed in the attachment to this affidavit.

_____
XXXX X XXXXXXX
Special Agent
Drug Enforcement Administration


SWORN TO AND SUBSCRIBED Before Me this \_\_\_\_\_ day of July 2005.


_____
United States Magistrate Judge
District of Columbia